IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE JAMES MADISON PROJECT,

    Plaintiff,

           v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

    Defendants.

No. 1:16-CV-02531-TNM

## DECLARATION OF STEVEN E. THOMPSON

I, STEVEN E. THOMPSON, hereby declare and state:

1.    I am currently the Chief of Policy, Information, Performance, and Exports for the National Security Agency ("NSA" or "Agency"). I have been employed with NSA since 1983 and have served in this position since 2017. (Prior to May, 2018, this position was known as the Chief of Strategy, Plans, and Policy.) In this position, I am responsible for oversight of NSA's Freedom of Information Act/Privacy Act Office ("NSA FOIA Office"). This office has primary responsibility for responding to requests for NSA records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In my 34 years with NSA prior to this assignment, I have held various leadership positions throughout the Agency and elsewhere in the Executive Branch, and have a detailed understanding of NSA's operations, management processes, and resources. My prior senior and supervisory positions include serving as the Deputy Chief of Staff for Policy and Corporate Issues in the Agency's Signals Intelligence Directorate, Deputy Special U.S. Liaison Officer London, Director for Cybersecurity at the National Security Council, and Director for Strategic Foundations in the Joint Interagency Cyber Task Force.

1

2.     I am also a TOP SECRET classification authority pursuant to Executive Order ("E.O.") 13526, which includes intelligence activities (including covert actions), intelligence sources and methods, or cryptology. *See* E.O. 13526 § 1.4(c) dated 29 December 2009 (75 Fed. Reg. 707). The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and on conclusions and determinations reached and made in accordance therewith.

3.     Given the nature of my official duties, I am familiar with NSA's procedures for responding to requests for information pursuant to the FOIA and the Privacy Act. I am accordingly familiar with the response sent by the NSA FOIA Office on 15 February 2018 (and transmitted to Plaintiff by the attorney representing Defendants in the above-captioned Action) in which NSA provides its final response, withholding certain information as exempt from disclosure pursuant to certain applicable exemptions of the FOIA.

4.     The purpose of this declaration is to explain to the Court the reasoning behind NSA's withholdings pursuant to Exemptions 1, 3, 5, and 6 of the FOIA, 5 U.S.C. § 552(b)(1), (3), (5), (6), as well as to discuss the parameters of NSA's supplemental search for responsive materials.

## ORIGIN AND MISSION OF NSA

5.     The NSA was established by Presidential Directive in October 1952 as a separately organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense. NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information, for foreign intelligence and counterintelligence purposes to support

2

national and departmental missions to include the conduct of military operations. *See* E.O. 12333, section 1.7(c), as amended.

6.     In performing its SIGINT mission, NSA exploits foreign signals to obtain intelligence information necessary to the national defense, national security, and/or the conduct of foreign affairs. NSA has developed a worldwide SIGINT collection network that relies on sophisticated collection and processing technology to acquire foreign signals. The technological infrastructure that supports NSA's SIGINT collection network has taken years to develop at a cost of billions of dollars and untold human effort. It relies on sophisticated collection and processing technologies designed to keep pace with challenging new technological developments.

7.     There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats to the nation and its allies. The second reason is to obtain the information necessary to direct the foreign policy of the United States. Foreign intelligence information provided by the NSA is routinely distributed in a classified setting to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury, and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Departments of the Army, Navy, and Air Force, and various intelligence components of the Department of Defense. Information provided by NSA is relevant to a wide range of important

issues, including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

8. NSA's ability to produce SIGINT information depends on its continued access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

9. Information obtained from intercepted foreign communications is called communications intelligence ("COMINT"), a subset of SIGINT information. NSA's COMINT efforts constitute only part of the functions and activities of the Agency. A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because of the fragility of the ability to exploit foreign communications. Disclosure of the identity of the targets, the ability to exploit those targets, or the vulnerability of particular foreign communications would encourage countermeasures by the targets of NSA's COMINT efforts. Disclosure of even a single intercepted communication holds the potential to reveal the intelligence collection techniques that are applied against targets around the world. Once alerted, COMINT targets may change the way they communicate, which could inhibit access to the target's communications, and therefore, deny the United States access to information crucial to the defense of the United States, both at home

4

and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of that target's signals, which may never again occur. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the Intelligence Community ("IC") must operate without the information the signals provided. Such losses are extremely harmful to the national security of the United States.

10.     Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed statutes to protect the fragile nature of NSA's SIGINT efforts. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. These statutes are: Section 6 of the National Security Agency Act of 1959 (codified at 50 U.S.C. § 3605); Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (codified at 50 U.S.C. § 3024); and 18 U.S.C. § 798. Under these three statutes, NSA is specifically authorized to protect certain information concerning its activities and its intelligence sources and methods from public disclosure.

11.     Critically, NSA has a twofold mission: Cybersecurity and Signals Intelligence. On its face, the type of information requested by Plaintiff here, namely the "memorializ[ation] of investigations" does not plainly fall within either mission. NSA is not an investigative agency, meaning that its authorities, as discussed above, do not extend to conducting investigations. Accordingly, information in the possession of NSA that is responsive to this request tends to reflect an intersection of NSA's own mission and the investigations conducted

5

by others. *See, e.g., infra* ¶ 28 (discussion of responsive material produced by NSA in February 2018).

## NSA FOIA POLICY AND PROCEDURE

12.     NSA responds to all perfected FOIA requests in compliance with the law and in a manner that is both fair and reasonable to each requester.  In order to implement this policy, NSA generally maintains a "first-in, first-out" system for processing FOIA requests made directly to the NSA as well as referrals and consultations from other agencies.

13.     When the NSA FOIA Office receives a perfected FOIA request, it assigns a case number to the request and logs the request into the Agency's FOIA database.  A member of the FOIA Office then searches this database to determine if there have been any previous requests seeking similar information.  If any such requests have been received, records associated with their processing are reviewed to determine whether they have any bearing on the current request and would assist the FOIA office in processing it.  In reviewing a perfected FOIA request, the FOIA Office also assesses the extent to which the request seeks intelligence records.  In many instances where such records are sought, the mere acknowledgment of whether NSA possesses records or does not would itself put at risk NSA intelligence capabilities as the response would reveal specific methods NSA uses to obtain foreign intelligence, ongoing intelligence collection activities, specific intelligence targets NSA has under surveillance, or intelligence topics of interest to national policymakers and military commanders.  In such instances, the Agency may be required to issue a *Glomar* response in order to protect sensitive and/or classified information vital to national security.[1]

---

[1] A decision neither to confirm nor deny the existence of information requested pursuant to the FOIA is commonly known as a "Glomar" response in reference to the subject of a FOIA request for records pertaining to a ship, the "Hughes Glomar Explorer." *See Phillipi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).

## PLAINTIFF'S FOIA REQUEST

14.     By email dated 30 November 2016, Plaintiff James Madison Project ("JMP" or "Plaintiff") submitted a FOIA request seeking the following:

> [R]ecords memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016. The scope of the search should include any final determinations identifying individual U.S. states whose election systems were targeted and/or breached, any U.S. states whose vote tabulations were altered, and any determinations made regarding the identity of the perpetrator(s) of these acts.
>
> *See* Exhibit A.

15.     The time frame specified for the above request was January 1, 2015 through the "date of acceptance of this request."

16.     Plaintiff also requested a waiver or reduction in fees, arguing that JMP qualified "for designation as [a] representative[] of the news media." *See id.*

17.     By letter dated 19 December 2016, NSA responded to Plaintiff's FOIA request, assigning it Case Number 100294, in accordance with its FOIA Office's procedures. *See* Exhibit B.

18.     NSA's response explained that although the requested information did "not fall within the purview of [the] Agency," NSA nevertheless "conducted a search reasonably calculated to uncover relevant documents, and as expected, . . . could not locate records responsive to [the] request." The letter also stated that there were no assessable fees for the request; accordingly, Plaintiff's fee category and request for waiver were not addressed. *See id.*

7

19.     Plaintiff appealed NSA's response via letter dated 3 January 2017, which was received by the NSA FOIA Office on 12 January, "challenging the adequacy of the search conducted." NSA, acknowledged Plaintiff's appeal dated 24 January 2017. Exhibit C.

20.     On 20 March 2017, Plaintiff amended a prior-existing Complaint to include NSA and the Federal Election Commission. At the time, the Agency had not addressed Plaintiff's appeal. *See* Exhibit D.

21.     By order of the Court, which directed the parties to make final responses to Plaintiff's FOIA requests, including the production of any non-exempt records that are subject to FOIA and responsive to Plaintiff's requests, NSA responded on 15 February 2018 and provided two documents responsive to Plaintiff's request. As detailed in the response letter, NSA redacted certain information in these records pursuant to FOIA Exemptions 3, 5, and 6. Additionally, the letter specified that NSA withheld an unspecified number of documents responsive to Plaintiff's request pursuant to FOIA Exemptions 1, 3, and 5. *See* Exhibit E.

## AGENCY'S SEARCH FOR RESPONSIVE DOCUMENTS

22.     As stated in NSA's initial response to Plaintiff's FOIA request, dated 19 December 2016, NSA did conduct one search upon first receiving Plaintiff's 30 November letter. However, further to NSA's final response dated 15 February 2018, as a result of the litigation and upon additional review of Plaintiff's FOIA request, NSA conducted an additional search for responsive records to ensure a comprehensive search for relevant material among NSA's holdings.

23.     NSA relied on the plain language and specificity of Plaintiff's request in order to interpret the results of this additional search. NSA conducted searches of particular directorates and organizations that NSA determined were most likely to possess responsive

8

records, to the extent responsive records existed. Personnel from NSA's Office of General Counsel ("OGC"), in coordination with the FOIA Office, directed and assisted in the search for responsive records.

24. Specifically, NSA OGC requested that the following personnel conduct searches for relevant records: the Director, Deputy Director[2], Executive Director, General Counsel, Principal Deputy General Counsel, additional OGC personnel likely to possess responsive records, and the Chief of Legislative, State & Local Affairs ("LSLA") (collectively, the "Custodians"). NSA OGC, in coordination with the FOIA Office, determined, based on their familiarity with NSA's organization and operations, that no other components of NSA were likely to possess additional materials responsive to Plaintiff's request.

25. In tasking this search, NSA OGC directed the Custodians to search their email records, as well as electronic files, for any investigative records reflecting "possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016," to include "any final determinations identifying individual U.S. states whose election systems were targeted and/or breached, any U.S. states whose vote tabulations were altered, and any determinations made regarding the identity of the perpetrator(s) of these acts." NSA worked closely with the Custodians (and/or their immediate staff) to search across NSA systems for these materials. The approaches to this collection varied across Custodians depending on numerous factors to include the volume of potentially responsive records, the systems in which potentially responsive records were stored, the organization of potentially responsive records, and the Custodians' familiarity with the potentially responsive records

---

[2] NSA collected records from both Deputy Director George C. Barnes and former Deputy Director Richard Ledgett, as the time-frame for the search encompassed each official's tenure. The searches of Mr. Ledgett's records, by contrast to the other searches, were conducted across a document management system retaining his archived electronic records.

implicated. In certain instances, this collection involved the use of targeted search terms, including, for example, terms such as "U.S. election," "interference," "investigate," "investigation," and "influence." In other cases, Custodians provided broad categories of documents to OGC. In circumstances where Custodians did not use search terms in the collection of their records, they were able to provide documents based on their familiarity with the at-issue subject matter and the organization of their records, which did not require search terms in order to isolate potentially responsive material. In all instances, documents were provided with the understanding that OGC personnel would conduct a further substantive review of the collected materials in order to determine responsiveness.

26.    Accordingly, after collecting potentially responsive records from the Custodians, personnel from OGC conducted a first-level review of the materials to determine if they were, in fact, responsive to Plaintiff's request. OGC personnel, including leadership within OGC, then conducted a second-level review of selected materials to determine, in certain instances, responsiveness, as well as segregability. Ultimately, OGC determined that two responsive documents were segregable, containing non-exempt material releasable to Plaintiff. In coordination with the FOIA Office, NSA redacted certain information from these documents, which is exempt from disclosure, as detailed below.

27.    The documents released to Plaintiff reflect (1) a letter from the California Secretary of State to Admiral Rogers, then-Director of NSA, concerning the 2016 presidential election; and (2) Admiral Rogers' response letter to Secretary Padilla, together with an NSA Staff Processing Form ("SPF") cover sheet. The only redactions in materials released to Plaintiffs appear on the SPF. Exhibits F & G.

10

28.    NSA reviewing personnel deemed Secretary Padilla's letter responsive in light of its memorialization of the Secretary's own inquiry, as the State's Chief Elections Officer, into the election, as well as its discussion of an alert issued by the Federal Bureau of Investigation ("FBI") and coordination among states and the Department of Homeland Security ("DHS") concerning election security.  This letter could also be interpreted as memorializing investigations into issues central to the FOIA request. *Id.*

29.    NSA's response letter also mentioned DHS and FBI's close work with state and local election officials during the 2016 elections in order to safeguard state voter registration systems from hostile actors.  *Id.*  Both DHS and FBI, unlike NSA, possess investigative authorities, and in light of that fact, as well as the overarching topic of Admiral Rogers' letter, NSA personnel deemed this correspondence responsive.  Admiral Rogers' letter also underscores the above-referenced scope of NSA's mission and work: namely, that "NSA provides key intelligence insights in the effort to thwart hostile foreign entities from interference with [among other things] our nation's elections on any level." *Id.*  These insights (which are generally classified in nature) reflect *intelligence* derived from SIGINT, and, while they may be used by recipient agencies, to include those agencies possessing investigative authorities, such intelligence insights themselves are not investigatory, but rather, analytical, in nature.

30.    NSA identified and searched the NSA components that were likely to possess records responsive to the FOIA request, and identified and used search methods that were reasonably likely to identify all responsive NSA records.  This approach resulted in the release of two documents to Plaintiff that were determined to contain segregable non-exempt information.  Additional pages of responsive material were identified during the course of this

11

search, and were determined by OGC personnel to contain non-segregable information that is both classified and protected from disclosure by statute.

## REDACTED MATERIAL IN DOCUMENTS RELEASED IN PART IS PROTECTED FROM DISCLOSURE PURSUANT TO EXEMPTIONS 3, 5, AND 6

31. As noted above, the only information redacted from NSA's disclosures appears on the SPF. These redactions, which underscore the segregability review in which NSA engaged during this process, were made pursuant to Exemptions 3, 5, and 6 of the FOIA, as further detailed below.

32. Based on my position as the Chief of Policy, Information, Performance, and Exports, the Agency official responsible for the processing of all requests made pursuant to FOIA, I am confident in NSA's determination that the redacted information is exempt from disclosure pursuant to the FOIA and no more exempt, reasonably segregable material, with the one exception noted below, can be released.

### FOIA Exemption 3

33. Section 552(b)(3) of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, so long as such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding, or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3). Review of the application of this section of the FOIA consists solely of determining that the statute relied upon qualifies as an exempting statute under Exemption 3 and that the information withheld falls within the scope of the statute. No showing of national security harm is required in order to maintain a proper exemption pursuant to Exemption 3.

12

34.    The redacted material subject to this exemption plainly falls within NSA's unique statutory privilege: Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605. As noted above, Section 6 is a statutory privilege unique to NSA and provides that **"nothing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or the names, titles, salaries, or number of the persons employed by such agency** (emphasis added)." By this language, Congress expressed its finding that disclosure of any information relating to NSA organization, function, activities, and personnel is potentially harmful. The protection provided by this statute is, by its very terms, absolute, as Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities. Further, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege; rather, NSA need only to show that the information falls within the scope of Section 6. NSA's organization, function, activities, and nonpublic personnel are therefore protected from disclosure regardless of whether or not the information is classified.

35.    Here, first and foremost, NSA has redacted the SPF summary, which includes the purpose, topic area, background, and recommendation for the Director concerning this letter response. These details plainly reflect NSA activities, as they relate to an NSA-specific inquiry from the Secretary of State. Moreover, these details reflect the organization of the NSA to the extent they reflect the review processes involved in the submission of the SPF to Admiral Rogers. Such information is properly redacted, because it is contained within the ambit of Section 6, and, accordingly, protected from disclosure by Exemption 3, which safeguards such specific, statutory privileges.

13

36.     Also redacted pursuant to Exemption 3 are the names of non-public NSA personnel. NSA/CSS Policy 1-69, "NSA/CSS Designated Public Positions," designates those positions that authorize its holders to represent the Agency publicly and/or sign public documents as part of their official duties. Individuals are only publicly acknowledged for the time period that they hold that designated public position. Accordingly, when an individual does not serve in one of these designated public positions, NSA protects his name and affiliation with the Agency pursuant to Public Law 86-36, which, as noted, protects from disclosure the names and titles of those employed with NSA. Here, with one exception,[3] NSA redacted the names of those personnel who do not hold designated public positions whose names appear on the SPF. This material is appropriately redacted pursuant to Exemption 3 of the FOIA, as it reflects information that squarely falls within the explicit protections of Section 6.

FOIA Exemption 5

37.     FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, this exemption protects records which would normally be privileged in the civil discovery context. Among these privileges, and applicable here, is the deliberative process privilege. This privilege prevents disclosures that would be harmful to agency decision-making. Accordingly, material that was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, proposals, conclusions, or recommendations is appropriately withheld. This privilege prevents the chilling effect of disclosures of policy-making discussions that occur in advance of final

---

[3] Upon further review in connection with this Declaration, NSA has determined that one individual's name, who holds a designated public position, was also redacted. NSA is accordingly re-producing the redacted SPF with a supplemental release of this additional personnel name. *See* Exhibit H.

14

implementation and decision-making. Candid back-and-forth is a critical aspect of the policy-making process, and if personnel knew that evolving opinions could be released to the public, it follows that discourse would be stifled. The deliberative process privilege requires that the withheld information is "pre-decisional," meaning it occurred before the final policy implementation, as well as "deliberative," constituting, for example, the weighing of multiple potential courses of action.

38.      Here, the withheld material from the SPF is plainly both pre-decisional and deliberative. The SPF, which is dated 13 July, precedes the Director's response letter, dated 14 July, the following day. Accordingly, the presentation of the issues in the SPF predated the final implementation of the response letter. Additionally, the SPF, as a whole, is plainly designed to present a recommended course of action to Admiral Rogers concerning Secretary Padilla's letter. While NSA did not withhold the entire document as deliberative, segregating certain releasable information, it redacted the "summary" section, which contains the substantive recommendation for Admiral Rogers, as well as additional details concerning the approach and topic at hand. These factors underscore the appropriateness of NSA's withholdings with respect to this document.

39.      While Admiral Rogers did sign the letter included with the SPF, there is no indication of the specific reasoning behind that decision, nor is there an implicit adoption of the statements made in the pre-decisional summary. Instead, the redacted portion plainly reflects deliberations that were part of a decision-making process but which do not reflect a public agency position, nor effective law or policy in and of themselves. As such, these redactions remain proper.

15

FOIA Exemption 6

40.    Lastly, § 552(b)(6) of the FOIA protects from disclosure information whose release would lead to a clearly unwarranted invasion of personal privacy. In order to determine whether material is properly withheld pursuant to this exemption, an agency must conduct a balancing test, weighing the public interest in disclosure versus the privacy interest at stake.

41.    Here, a careful examination of the withheld material reveals that the public interest in disclosure is minimal and clearly outweighed by the privacy interest involved. Specifically, the only material withheld pursuant to Exemption 6 are the signatures of certain public officials. Accordingly, NSA has released the positions, and in one case, the name (Director, Deputy Director, Executive Director, Chief of Staff, Chief of LSLA), but withheld the form of these individuals' signatures pursuant to this exemption. Accordingly, there is no public interest to the release of the signatures themselves, as the reviewing chain of command for the SPF is already evident from the released material, namely the positions and name evident on the face of the document. NSA routinely withholds signatures pursuant to Exemption 6, as an individual has an obvious privacy interest in the form of their signature. Even in those instances where an individual holds a public position pursuant to NSA policy and signs documents and correspondence releasable to the public, the specific form of that individual's signature on an internal document is properly withheld.

16

## MATERIALS WITHHELD IN FULL ARE PROTECTED FROM DISCLOSURE
## PURSUANT TO EXEMPTIONS 1, 3, AND 5

42.     In addition to the redacted material on the two documents released in part, NSA also withheld from disclosure an unspecified number of pages[4] pursuant to Exemptions 1, 3, and 5. While most, if not all, of this material is classified and non-segregable for that reason alone, Exemptions 3 and 5 are also implicated in the withheld material, as described in further detail below, and thus NSA is unable to produce any non-exempt portions of the responsive materials. In sum, I have reviewed the material withheld in full and determined that no reasonably segregable portions can be released.

### FOIA Exemption 1

43.     Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized – under criteria established by an Executive Order – to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order. The current Executive Order that establishes such criteria is E.O. 13526.

44.     Section 1.1 of E.O. 13526 provides that information may be originally classified if: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the government; (3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

---

[4] For a description of the reasoning behind NSA's decision to withhold the number of pages of material withheld in full, please see *infra*. As further described below, NSA is unable to provide further unclassified details concerning the material withheld in full without risking, at minimum, serious damage to national security.

17

45.    Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. The category of classified information at issue here is that found in Section 1.4(c), which includes intelligence activities (including covert action), intelligence sources and methods, or cryptology. Disclosure of the withheld information would reveal information related to this category that is currently and properly classified as set forth in Section 1.4(c) of E.O. 13526.

46.    The release of the materials withheld in full would disclose information that is currently and properly classified TOP SECRET and/or SECRET pursuant to Section 1.2(a)(1) and (2) of E.O. 13526, because the information could reasonably could be expected to cause exceptionally grave damage and/or serious damage to the national security. Any disclosure of this information would obviously and immediately affect the ability of NSA to counter threats to the national security of the United States.

47.    In my role as a TOP SECRET original classification authority ("OCA"), I am authorized to make classification decisions at the TOP SECRET, SECRET, and CONFIDENTIAL, levels. As set out below, I reviewed the categories of information withheld in full pursuant to this FOIA request and determined that those categories are currently and properly classified in accordance with E.O. 13526. Based on that determination, I have further determined that the responsive material at issue was properly withheld, as all of this information is currently and properly classified in accordance with E.O. 13526. Accordingly, the release of this intelligence information could reasonably be expected to cause damage to the national security. The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified

information is described below. Finally, in accordance with Section 1.7 of E.O. 13526, no information was classified or withheld in order to conceal violations of law, or to prevent embarrassment to the Agency.

48.     All of the documents withheld in full by NSA are currently and properly classified.[5] In fact, the vast majority of these records are classified TOP SECRET,[6] underscoring the exceptionally grave damage that would be implicated by their release. Moreover, I have determined that the classified material withheld in full does not contain meaningfully segregable information that could be released to the public. This is so for several reasons. Firstly, in many instances the withheld material, which are largely email, do not contain any non-classified material. Second, even in those documents where there are stray lines containing unclassified or U//FOUO material, that material, without more, is not meaningful or substantive (e.g., email signature blocks). Finally, the majority of these documents concern specific topics the very existence of which are classified. While NSA is prepared to state, on the public record, that it has withheld an unspecified number of materials responsive to Plaintiff's request, namely, records relating to memorialization of "investigations conducted into possible interference by foreign government or non-governmental organizations with the U.S. election on November 8, 2016," it cannot provide

---

[5] NSA has determined that the small number of documents withheld in full classified as U//FOUO are incorrectly classified and reflect, at least, a SECRET-level classification. However, to the extent that these documents are not considered classified, they remain exempt from disclosure pursuant to Exemption 3, as described further *infra*.

[6] In fact, many of the TOP SECRET documents have additional classifications indicating the sensitivity of the material at issue. For example, many of the documents are marked with the "ORCON" designator, indicating that the originator of the information controls to whom it is released. Even the documents classified SECRET contain the designator "NOFORN," indicating that the information may not be released to foreign governments, foreign nationals, or non-U.S. citizens without permission of the originator and in accordance with DNI policy.

19

additional detail concerning the withheld material without risking exceptionally grave, or, serious (for those documents classified as SECRET) damage to national security.

49.    In certain instances, these withheld documents contain specific information concerning NSA targets, which plainly cannot be released to the public without exceptionally grave damage to national security. If targets were aware of NSA's capabilities against them, they would likely change their methods to evade collection, which could undermine NSA's entire mission. In other instances, these documents contain intelligence reporting derived from SIGINT and associated analysis or explanation. These intelligence reports are some of the most closely held and protected products that NSA creates, and cannot be disclosed without risk to national security given the insights they provide.

50.    Still others of these withheld documents reflect information-sharing with other governmental entities. While it is public information that NSA, as part of its mission, provides information to senior government officials and other agencies, as reflected in the withheld material, NSA's very relationship with these specific governmental partners in the context of the specific terms of this FOIA request is classified. Accordingly, while generally I can describe this category of material on the public record, the specific interaction between NSA and other agencies in the context of material responsive to Plaintiff's FOIA request remains currently and properly classified. Public disclosure of such information would harm not only NSA's capabilities, but also, potentially harm NSA's relationship with and support to its partners in the IC.

51.    The vast majority of the documents withheld in full by NSA are classified at levels which, on their face, indicate the sensitivity of the at-issue material. Moreover, this classified material does not contain meaningfully segregable portions, and, in most instances

20

the very existence of the specific material withheld is classified. While it goes without saying that topics relating to the 2016 election have been the subject of discussion in the press, as well as elsewhere in the public realm—to include hearings before Congress—that fact alone does not serve to declassify details concerning NSA activities that are related to the topic of potential election interference. In sum, while NSA has publicly acknowledged, among other things, that it contributed to the Intelligence Community Assessment ("ICA") entitled "Assessing Russian Activities and Intentions in Recent U.S. Elections," the scope and details of its contribution, as well as its activities related to the election more generally, remain currently and properly classified. Accordingly, while NSA may, without harm to national security, publicly state that it possesses material responsive to Plaintiff's FOIA request, it does not follow from that admission that NSA must in turn reveal classified details concerning such material.

FOIA Exemption 3

52.    While, for the aforementioned reasons, the materials withheld in full are currently and properly classified and accordingly exempt from disclosure pursuant to Exemption 1, the Court need not consider the classification issue, as all requested records are concurrently exempt pursuant to Exemption 3. 5 U.S.C. § 552(b)(3).

53.    As discussed above, with respect to the redacted material in NSA's produced documents, Exemption 3 of the FOIA provides that the FOIA does not require the disclosure of matters that are specifically exempted from disclosure by statute, so long as such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes a particular criteria for withholding or refers to particular types of matters to be withheld. *See id.* Again, review of the application of

21

Exemption 3 statutes consists only of determining that the statute relied upon qualifies as an Exemption 3 statute and that the information withheld falls within the scope of the statute. By contrast to Exemption 1, no showing of national security harm is required in order to maintain a proper exemption pursuant to Exemption 3.

54.     The information withheld in full here is protected from disclosure by several statutes. First and foremost, the withheld documents concern NSA's SIGINT efforts, which implicate both the Agency's core functions and activities, as well as intelligence sources and methods. As such, they fall squarely within the scope of NSA's unique statutory privilege: Section 6 of the National Security Agency Act. Congress enacted this statute to protect the fragile nature of NSA's SIGINT efforts, including, but not limited to, the existence and depth of signal intelligence-related analytical successes, weaknesses, and exploitation techniques. This statute recognizes the vulnerability of SIGINT to countermeasures and the significance of the potential loss of valuable intelligence information to national policymakers, combatant commanders, and the IC.

55.     As noted above, Section 6 is a statutory privilege unique to NSA and provides that **"nothing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof . . . ."** (emphasis added). By this language, Congress expressed its finding that disclosure of any information relating to NSA activities is potentially harmful. The protection provided by this statute is, by its very terms, absolute, as Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities. Further, while, in this case, the harm would be exceptionally grave, NSA is not required to demonstrate specific

22

harm to national security when invoking this statutory privilege; rather, NSA need only to show that the information relates to its activities, falling within the scope of Section 6. NSA's function and activities are therefore protected from disclosure regardless of whether or not the information is classified.

56.    Moreover, another core function and primary activity of NSA is the provision of intelligence information to principals, advisors, and leaders in the United States government. To the extent that these materials reflect NSA's support to other components of the government, that too falls directly within the statutory protections of Section 6, enabling NSA to protect from disclosure these sensitive interactions. To find that NSA's provision of intelligence information to other agencies within the U.S. government falls outside of the scope of the activities and function protected by Section 6 would invite an avalanche of disclosures concerning, in many instances, some of the most sensitive of NSA's activities. Congress' intent with respect to the protection of NSA's organization, function, and activities is manifest by the plain language of Section 6; where, as here, the disclosure of the requested information would improperly reveal aspects of NSA's mission, the invocation of Exemption 3 pursuant to this statute is proper.

57.    In addition to the plainly applicable statutory framework of Section 6, the materials withheld in full also are protected from disclosure by 18 U.S.C § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communication intelligence activities of the United States, or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government. The term "communication intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients." 18 U.S.C. § 798(b). As

23

noted above, some of the withheld material implicates specific targets of NSA's foreign intelligence. This material, while classified, is also plainly protected by the strictures of § 798. This statutory scheme underscores Congress' commitment to protecting communication intelligence, which is central to NSA's mission, from disclosure. Here, given the classified nature of the withheld material, as well as its reflection of NSA's core activities, it is axiomatic that disclosure of the withheld information about this intelligence source (communication intelligence) and the related methods used to secure it, would reveal critical information about the means through which NSA collects and processes communication intelligence, plainly falling within the scope of this statutory scheme.

58.    Finally, the withheld material is protected from disclosure by Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." NSA, as a member agency of the U.S. IC, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024. Here, the details of the withheld material responsive to Plaintiff's request concerning the 2016 election plainly implicate critical sources and methods. Detailed discussions about circulated intelligence reports, NSA capabilities, and inter-agency cooperation on issues relating to election interference, all of which generally describe the type of information present in these withheld materials, reflect the very sources and methods this statute is designed to protect.

24

59.    Based upon my review, I therefore conclude that the records withheld in full are not only exempt from disclosure due to their classified nature, but also, in light of the fact that their contents are plainly protected from release by the aforementioned three statutory authorities: (1) Section 6, 50 U.S.C. § 3605, because the withheld information concerns the core function and/or activities of NSA; (2) 18 U.S.C. § 798, because disclosure could reveal classified information derived from NSA's exploitation of foreign communications; and (3) Section 102A(i)(1), 50 U.S.C. § 3024, because the information concerns intelligence sources and methods.  For these reasons, all of the documents withheld in full, are, in the alternative, protected from disclosure pursuant to Exemption 3.

### FOIA Exemption 5

60.    Lastly, much of the material withheld in full is also protected from disclosure pursuant to Exemption 5.  While all documents to which this exemption is applicable are also properly withheld pursuant to Exemption 1 and/or 3, as described above, NSA's withholding of certain material is also justified by Exemption 5.  As discussed previously, Exemption 5 protects from disclosure material that would not be available to a party in litigation with the Agency.  5 U.S.C. § 552(b).  Two of the privileges implicated by this exemption are the attorney-client privilege and the deliberative process privilege.  Both are at issue here.

61.    Given that certain of the Custodians tasked in NSA's search for relevant material responsive to Plaintiff's FOIA request were members of OGC, it is not surprising that the attorney-client privilege is at issue in many of the documents withheld in full.  In fact, nearly all of the documents withheld in full reflect, in whole or in part, material subject to the attorney-client privilege.  Specifically, these documents reflect (1) information requested by counsel (OGC) to facilitate the provision of legal advice to NSA; (2) information provided to

counsel (OGC) to facilitate the provision of legal advice to NSA; (3) recommendations by counsel to components of NSA concerning proper legal interpretation of myriad issues; and (4) requests for legal advice by components of NSA concerning legal issues. Such material is plainly properly withheld pursuant to Exemption 5, as it implicates the attorney-client privilege. Given that all the material withheld in full was properly withheld pursuant to Exemptions 1 and/or 3, NSA did not conduct a line-by-line segregability review to determine, for each withheld document, which portions reflected attorney-client information. However, NSA did engage in an overarching review to determine which *documents*, either in whole or in part, reflected privileged communications between attorney and client and thus, implicated Exemption 5.

62.    Additionally, certain of these withheld materials reflect information exempt from disclosure due to the deliberative process privilege. As discussed above, the deliberative process privilege encourages candid discussions among decision-makers as policy determinations are made by protecting these non-final deliberations from public scrutiny. Here, many documents contain draft correspondence or memoranda that reflect recommendations to senior officials at NSA concerning courses of action. Such recommendations are properly withheld pursuant to this privilege, as they reflect ongoing back-and-forth concerning potential policy or legal decisions, as opposed to a final determination reflecting the Agency's adopted approach or working law. Accordingly, these drafts and proposals are independently exempt as they reflect material subject to the deliberative process privilege.

63. In sum, many of the materials withheld in full implicate both the attorney-client and deliberative process privilege as well, underscoring their exemption from disclosure pursuant to an independent prong of the FOIA, namely, Exemption 5.

**ADDITIONAL DETAILS CONCERNING THE DOCUMENTS WITHHELD IN FULL, TO INCLUDE THE NUMBER AND NAME OF DOCUMENTS, ARE CLASSIFIED AND PROTECTED FROM DISCLOSURE BY STATUTE AND THUS <u>FALL UNDER FOIA EXEMPTIONS 1 AND 3</u>**

64. As noted in NSA's response letter dated 15 February, NSA has determined that additional details concerning the documents withheld in full, such as the number of pages, the number of documents, the titles of the documents, and/or the subject-matter of the documents (beyond the fact that they are generally responsive to Plaintiff's FOIA request), are both classified and protected from disclosure by statute. Based upon my review, NSA cannot disclose even this type of high-level information without risk of, at minimum, serious damage to national security. Moreover, to the extent certain of this information, standing alone, is UNCLASSIFIED (*e.g.*, a standalone email subject line), its provision, together with the aforementioned additional information, would complete a picture that reveals classified information concerning NSA. All of this information remains subject to statutory protection as well, because its disclosure would reveal the organization, function and/or activities of NSA. At bottom, NSA's protection of this general document information centers on the fact that its disclosure would potentially reveal the following: (1) the scope of NSA's materials concerning interference in the 2016 election; (2) details concerning the specific support NSA provides to other agencies within the IC; and (3) information concerning NSA's internal activities such as cover terms, review processes, and other sensitive information.

27

65.    First, as noted above, the fact of NSA's contribution to the ICA is public. However, the ICA, on its face, is a "declassified version of a *highly classified assessment.*"[7] No details concerning NSA's contribution, or the scope of that contribution, are publicly available. Instead, NSA has repeatedly emphasized in public forums that such details must remain classified due to their sensitivity and the potential harm caused by disclosure.[8] Accordingly, while the fact that NSA possesses material responsive to Plaintiff's request (which concerns foreign governmental or NGO interference in the 2016 election) may be released to the public, given NSA's stated involvement in the ICA, any details concerning NSA's contribution must remain protected.

66.    Disclosing details regarding the scope of NSA's contribution to the ICA risks the disclosure of information regarding NSA's critical capabilities, or lack thereof. For example, with respect to the *number* of withheld records, if NSA were to publicly state that it possessed some significant volume of records concerning election interference, the public—to include our adversaries—would obtain a clearer picture concerning the scope of NSA's insight into their activities, as well as potentially into NSA's capabilities. Conversely, were NSA to disclose that it possessed only a handful of records concerning this issue, the opposite inference could be made: namely, that NSA's capabilities against such actors are limited. Such details concerning insights provided by NSA for the ICA, or NSA's foreign intelligence relating to election interference generally, are currently and properly classified. Accordingly,

---

[7] *See* ICA, dated 6 January 2017, at I (emphasis added).

[8] *See* Hearing on "Russian Active Measures Investigation," United States House of Representatives Permanent Select Committee on Intelligence, Mar. 20, 2017, Testimony of Admiral Rogers ("In an open unclassified forum I am not going to talk about Russian tactics, techniques or procedures about how they executed their hacks.").

28

the revelation of this information would, at minimum, cause serious damage to national security by revealing critical NSA capabilities to the public at large.

67.    At bottom, this number of withheld documents cannot be revealed publicly, as any number would inevitably engender conclusions concerning the scope of NSA's SIGINT collection within the context of interference in the 2016 election. In order to continue to effectuate its mission, the scope of NSA's capabilities with respect to a particular issue (*i.e.*, elections) or a particular adversary (foreign governments and/or NGOs), must remain a closely held and classified matter. Without this protection, our abilities would be laid bare for adversaries to exploit as they attempt to foil NSA's activities, which are central to the national security.

68.    Second, in many instances, general details concerning the withheld material, such as at-issue topics, email subject lines, and/or sender and recipient information, reflect classified information concerning NSA's information sharing with other government agencies. While it is public that NSA, as a member of the IC, provides foreign intelligence to principals among the government, the details of that support, in this specific context, are classified and disclosure of that information could damage national security. For example, certain NSA collection capabilities could be revealed through the disclosure of information contained in an email subject line. Even the identities of the agencies with which NSA has been in contact concerning these issues, which could be revealed through recipient and sender information, as well as subject lines, have the potential to reveal classified information concerning the role NSA's foreign intelligence mission interfaces with the missions of other agencies. For example, the very fact that NSA was providing SIGINT information to a particular governmental agency, concerning the topic of this FOIA request, has the capacity to

29

reveal classified details concerning NSA's singular support to specific agencies. In such circumstances, NSA cannot reveal the fact of such support without disclosing the intricacies of these working relationships, to the extent multiple agencies are engaged in ongoing, classified efforts concerning election interference.

69.    Third, in certain instances, even the release of certain classification markings in the withheld material would disclose classified information; moreover, in at least one instance, identifying information concerning an NSA target appears in a subject line. This type of information is plainly classified and is revealed on the face of seemingly straightforward details concerning this material, such as the classification of each withheld document and/or the contents of the subject lines of responsive emails. The disclosure of such information could cause, at minimum, serious damage to national security, providing unparalleled insight into NSA activities related to Plaintiff's FOIA request.

70.    The above information, while generally classified as described above, is also protected from disclosure by NSA's statutory privilege under Section 6 of Public Law 86-36. The details and scope of NSA's intelligence contributions concerning interference in the 2016 election clearly reflect the activities and function of NSA. NSA's support to other IC components also reflects one of the core functions of NSA's mission. Moreover, to the extent that personnel (and/or reviewing organizations) are reflected in the responsive documents, details regarding NSA's organization may also be implicated. Accordingly, while NSA maintains that the number, name, scope, and any other details concerning the responsive materials collected as a result of this litigation are classified in nature, this information is afforded additional protection from disclosure pursuant to Section 6 of Public Law 86-36. And while the disclosure of this information would cause, at minimum, serious damage to

30

national security—as delineated above—Exemption 3 requires no showing of harm in order to establish its applicability.  In sum, NSA cannot disclose the above-mentioned additional details concerning these materials without revealing protected information.

71.     Similarly, this information is also protected by 50 U.S.C. § 3024.  To the extent that NSA reveals details concerning its targets or capabilities through the disclosure of information such as the name(s) and number of the withheld material, it would also be disclosing information concerning its sources and methods, which are properly protected by this statute.  Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute.  Moreover, whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024.  Here, any revelation concerning, for example, the subject-matter or titles of the at-issue withheld material, has the potential to reveal certain methods by which NSA conducts intelligence and the sources via which it collects that information.

72.     Accordingly, while the scope and details of NSA's withheld materials are classified in nature, they too are protected by two separate statutory schemes, underscoring the protected nature of this information.

## CONCLUSION

73.     Based upon my review, I therefore conclude the following, that: (1) in response to Plaintiff's FOIA request, NSA conducted a reasonable search designed to return responsive records; (2) the remaining redacted information withheld from the documents NSA produced

31

to Plaintiff in part was properly withheld pursuant to Exemptions 1, 3[9], 5, and 6 of the FOIA; (3) the information withheld in full was properly withheld pursuant to Exemptions 1, 3[10], and 5 of the FOIA; and (4) any details concerning the number, name, and scope of the responsive materials collected by NSA are classified, and accordingly, protected from disclosure pursuant to Exemption 1, and/or fall within Section 6, 50 U.S.C. § 3605 and/or 50 U.S.C. 3024(i), and are properly withheld pursuant to Exemption 3. For these reasons, NSA's withholdings in this matter are proper.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that Exhibits A through H attached hereto are true and correct copies. Executed, this 25th day of June 2018 pursuant to 28 U.S.C. § 1746.

STEVEN E. THOMPSON
Chief, Policy, Information, Performance, and Exports
National Security Agency

---

[9] This information falls within NSA's statutory privilege, Section 6 of the National Security Agency Act, 50 U.S.C. § 3605.

[10] This information falls within Section 6, as well as 18 U.S.C. § 798, because disclosure could reveal classified information derived from NSA's exploitation of foreign communications; and also Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, because the information concerns intelligence sources and methods.

32

# Exhibit A

**From:**

**Sent:**            Wednesday, November 30, 2016 9:23 PM

**To:**

**Subject:**           FOIA Request (Web form submission)

Title: Mr.

Full Name: Brad Moss

email: brad@markzaid.com

Company: Mark S. Zaid, P.C.

Postal Address: 1250 Connecticut Avenue, NW

Postal 2nd Line: Suite 200

Postal City: Washington

Postal State-prov: DC

Zip Code: 20036

Country: United States of America

Work Phone: 2029077945

Records Requested: This is a request on behalf of The James Madison Project ("JMP") and Louise Mensch ("Mrs. Mensch")(hereinafter referred to jointly as "JMP") under the Freedom of Information Act, 5 U.S.C. § 552, et seq. This request seeks copies of National Security Agency ("NSA") records, including cross-references. Specifically, JMP seeks records memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016. The scope of the search should include any final determinations identifying individual U.S. states whose election systems were targeted and/or breached, any U.S. states whose vote tabulations were altered, and any determinations made regarding the identity of the perpetrator(s) of these acts.

The NSA can limit the timeframe of its search from January 1, 2015, up until the date of acceptance of this request. The scope of the search should not be limited to NSA-originated records and should be construed to include records that are currently in the possession of a U.S. Government contractor for purposes of records management.

For context, on September 29, 2016, ABC News reported that nearly half of U.S. states had their voter registration systems targeted by foreign hackers, and that at least four of those states' systems had been breached. http://abcnews.go.com/US/russian-hackers-targeted-half-states-voter-registration-systems/story?id=42435822 (last accessed November 30, 2016). FBI Director James Comey ("Director Comey") specifically identified Russia as being at least partially involved in the attacks on U.S. election systems. http://abcnews.go.com/US/russian-hackers-targeted-half-states-voter-registration-systems/story?id=42435822 (last accessed November 30, 2016). The Department of Homeland Security acknowledged that it was offering assistance to individual states, and that at least four states had requested

1

such assistance. http://www.foxnews. com/politics/2016/09/30/us-official-hackers-targeted-election-systems-20-states.html (last accessed November 30, 2016). These targeted attacks came in the wake of a prior hack of the Democratic National Committee ("DNC"), an attack that the National Security Agency stated was "undoubtedly the work of a foreign government" and that resulted in the leak of countless internal DNC e-mails in the months preceding the election. http://www.washingtontimes.com/ news/2016/nov/16/dnc-hack-conscious-effort-nation-state-nsa-chief-s/ (last accessed November 30, 2016).

JMP is pre-emptively waiving any objection to the redaction of the names of any U.S. Government officials below a GS-14 position or whom otherwise were not acting in a supervisory position. JMP similarly waives any objection to redactions of the names of any U.S. Government contractors in a position of authority similar to that of a GS-13 series civilian employee or below.

In terms of all other third parties who work or worked for the U.S. Government and whose names appear in records responsive to this request, JMP submits that the privacy interests of those individuals have been diminished by virtue of their involvement in one or more of the U.S. Government functions described above as falling within the scope of this request. There is a recognized inverse relationship between the position of authority that a government employee holds and the strength of that employee's privacy interests. See Stern v. FBI, 737 F.2d 84, 92 (D.C. Cir. 1984); Jefferson v. Dep't of Justice, 2003 U.S. Dist. LEXIS 26782, *11 (D.D.C. Nov. 14, 2003); see also Perlman v. Dep't of Justice, 312 F.3d 100, 107-109 (2d. Cir. 2002)(setting forth five factors to consider in weighing government employee's privacy interests against public interest in disclosure, including employee's rank and whether information sheds light on a government activity).

The work performed by these third parties (whether they be Government officials or contractors) was part of their official responsibilities on behalf of the U.S. Government and was not of a personal nature. They served in a position of trust and authority to, among other things, conduct investigations to determine who (if anyone or any entity) targeted and/or breached any of the individual U.S. states' election systems. Given that responsive records memorializing the work they performed will shed light on government activity, explain how the U.S. Government conducted the investigations, and reveal whether the U.S. Government identified the perpetrator(s)(if any), it would be reasonable to conclude that the relevant third parties' respective (and diminished) privacy interests are outweighed by the public interest in disclosure of the information indexed to their name.

We are also requesting a waiver of or, at a minimum, a reduction in fees. At a minimum, both JMP and Mrs. Mensch qualify -- in their own respective right -- for designation as representatives of the news media.

2

**Exhibit B**



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case: 100294
19 December 2016

BRAD MOSS
MARK S ZAID PC
1250 CONNECTICUT AVE NW STE 200
WASHINGTON DC  20036

Dear Mr. Moss:

This responds to your Freedom of Information Act (FOIA) request of 30 November 2016, which was received by this office on 1 December 2016, for "...records memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016." Your letter has been assigned Case Number 100294. There are no assessable fees for this request; therefore, your fee category and request for a waiver of fees have not been addressed.

The National Security Agency/Central Security Service (NSA/CSS) is the nation's cryptologic organization, and we have a twofold mission. Our Information Assurance mission is to provide solutions, products, and services to protect U.S. information infrastructures critical to national security interests. In response to requirements set at the highest levels of government, our Signals Intelligence mission is to collect, process, and disseminate intelligence information from foreign signals for national foreign intelligence and counterintelligence purposes. The information you request does not fall within this Agency's intelligence mission or Information Assurance mission. Although the subject of your request does not fall within the purview of this Agency, we conducted a search reasonably calculated to uncover relevant documents, and as expected, we could not locate records responsive to your request.

You may appeal this decision. If you decide to appeal, you should do so in the manner outlined below.

ξ  The appeal request must be in writing and addressed to:

NSA/CSS FOIA/PA Appeal Authority (P132)
National Security Agency
9800 Savage Road STE 6932
Fort George G. Meade, MD  20755-6932

ξ  It must be postmarked no later than 90 calendar days of the date of this letter. Decisions appealed after 90 days will not be addressed.

FOIA Case: 100294

ξ   Please include the case number provided above.
ξ   Please describe with sufficient detail why you believe this denial was
    unwarranted.
ξ   NSA will endeavor to respond within 20 working days of receiving your appeal,
    absent any unusual circumstances.

   You may also contact our FOIA Public Liaison at foialo@nsa.gov for any further
assistance and to discuss any aspect of your request. Additionally, you may contact
the Office of Government Information Services (OGIS) at the National Archives and
Records Administration to inquire about the FOIA mediation services they offer. The
contact information for OGIS is as follows:

   Office of Government Information Services
   National Archives and Records Administration
   8601 Adelphi Rd- OGIS
   College Park, MD 20740
   ogis@nara.gov
   (877)684-6448
   (202)741-5770
   Fax (202)741-5769

   We recommend that you inquire with the FOIA office at the FBI and DHS, as
they may potentially have the information you are seeking. The contact information is
as follows:

   Federal Bureau of Investigation
   ATTN: Record and Information/Dissemination Section (RIDS)
   Service Request Unit 170
   Marcel Drive
   Winchester VA 22602

   Department of Homeland Security
   Attn: FOIA Office
   245 Murray Drive SW Bldg 410
   Stop-0655
   Washington DC 20528-0655

                              Sincerely,

                              JOHN R. CHAPMAN
                              Chief, FOIA/PA Office
                              NSA Initial Denial Authority

# Exhibit C

*Rec'd* JAN 1 2 2017

## The James Madison Project
### 1250 Connecticut Avenue, N.W.
### Suite 200
### Washington, D.C.  20036

(202) 498-0011
(202) 330-5610 fax

E-Mail: FOIA@JamesMadisonProject.org
http://www.JamesMadisonProject.org

January 3, 2017

VIA CERTIFIED MAIL

NSA/CSS FOIA/PA Appeal Authority (P132)
National Security Agency
9800 Savage Road, Ste. 6932
Fort George G. Meade, MD 20755-6932

Re:    FOIA Case: 100294

To whom it may concern

   This is an administrative appeal of NSA's decision, as set forth in its letter dated December 19, 2016. In the letter, NSA stated that a search for records responsive to the above-identified request number located no records.

   We are challenging the adequacy of the search conducted.

   Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me at (202) 907-7945 or via e-mail at brad@jamesmadisonproject.org.

Sincerely,

Bradley P. Moss
Deputy Executive Director

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Case: 100294/Appeal: 5030
24 January 2017

Mr. Bradley P. Moss
Deputy Executive Director
The James Madison Project
1250 Connecticut Ave., NW
Suite 200
Washington, DC 20036

Dear Mr. Moss:

This acknowledges receipt of your correspondence, dated 3 January 2017, appealing the National Security Agency/Central Security Service's (NSA/CSS') no records response to your request for "...records memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016." You have appealed the adequacy of the search conducted associated with your Freedom of Information Act (FOIA) request of 30 November 2016. Your appeal was received by the NSA/CSS FOIA/Privacy Act (PA) Appeal Authority Staff on 12 January 2017 and has been assigned Appeal Number 5030.

Please be advised that appeals are processed in the order in which they are received, on a first-in, first-out basis. At this time, there are a large number of appeals ahead of yours in our queue. We will begin to process your appeal and will respond to you again as soon as we are able. We appreciate your understanding in this matter.

Correspondence related to your request should include the case and appeal numbers assigned to your request and be addressed to the National Security Agency, Office of Information Management, FOIA/PA Appeals, 9800 Savage Road, Suite 6932, Fort George G. Meade, MD 20755-6932; or it may be sent via facsimile to 443-479-3612. If sent by fax, it should be marked for the attention of "FOIA Appeals." For inquiries regarding the status of your appeal, please contact this office via email at FOIA_Appeal_Status@nsa.gov.

Sincerely,

NSA/CSS FOIA/PA Appeal Authority Staff
Office of Information Management

# Exhibit D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE JAMES MADISON PROJECT | * | |
| 1250 Connecticut Avenue, NW | * | |
| Suite 200 | * | |
| Washington, D.C. 20036 | * | |
| | * | |
| and | * | |
| | * | |
| LOUISE MENSCH | * | |
| 116 West 80th Street | * | |
| New York, New York 10024 | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| DEPARTMENT OF JUSTICE | * | |
| 950 Pennsylvania Avenue, NW | * | |
| Washington, D.C. 20530-0001 | * | |
| | * | |
| and | * | Civil Action No. 16-2531 (RJL) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| Washington, D.C. 20505 | * | |
| | * | |
| and | * | |
| | * | |
| OFFICE OF THE DIRECTOR | * | |
| OF NATIONAL INTELLIGENCE | * | |
| Washington, D.C. 20511 | * | |
| | * | |
| and | * | |
| | * | |
| DEPARTMENT OF HOMELAND | * | |
| SECURITY | * | |
| STOP-0655 | * | |
| 245 Murray Lane, SW | * | |
| Washington, D.C. 20528-0655 | * | |
| | * | |
| and | * | |
| | * | |
| DEPARTMENT OF DEFENSE | * | |
| 1000 Defense Pentagon | * | |

| | |
|---|---|
| Washington, D.C. 20301-1000 | * |
| | * |
| and | * |
| | * |
| FEDERAL ELECTION COMMISSION | * |
| 999 E Street, NW | * |
| Washington, D.C. 20463 | * |
| | * |
| Defendants. | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## FIRST AMENDED COMPLAINT

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., as amended, for the disclosure of agency records improperly withheld from plaintiffs The James Madison Project and Louise Mensch by the defendants Department of Justice, Central Intelligence Agency, Office of the Director of National Intelligence, Department of Homeland Security, Department of Defense, and Federal Election Commission (as well as their subordinate entities).

## JURISDICTION

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendants pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2. Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff The James Madison Project ("JMP") is a non-partisan organization established in 1998 to promote government accountability and the reduction of secrecy, as well as educating the public on issues relating to intelligence and national security.

2

4.  Plaintiff Louise Mensch ("Mrs. Mensch") is a representative of the news media who currently oversees the media outlet Heat Street. She is a former Member of Parliament in the United Kingdom.

5.  Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552 (e). and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action. DOJ controls – and consequently serves as the proper party defendant for litigation purposes for – the National Security Division ("NSD") and the Federal Bureau of Investigation ("FBI").

6.  Defendant Central Intelligence Agency ("CIA") is an agency within the meaning of 5 U.S.C. § 552 (e). and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action.

7.  Defendant Office of the Director of National Intelligence ("ODNI") is an agency within the meaning of 5 U.S.C. § 552 (e). and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action.

8.  Defendant Department of Homeland Security ("DHS") is an agency within the meaning of 5 U.S.C. § 552 (e). and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action. DHS controls – and consequently serves as the proper party defendant for litigation purposes for – the Office of Intelligence and Analysis ("OIA").

9.  Defendant Department of Defense ("DoD") is an agency within the meaning of 5 U.S.C. § 552 (e). and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action. DoD controls – and consequently serves as the proper party defendant for litigation purposes for – the National Security Agency

3

("NSA").

10. Defendant Federal Election Commission ("FEC") is an agency within the meaning of 5 U.S.C. § 552 (e), and is in possession and/or control of the records requested by the plaintiffs that are the subject of this action.

## FACTUAL BACKGROUND

### Investigations into Election Interference

11. On September 29, 2016, ABC News reported that nearly half of U.S. states had their voter registration systems targeted by foreign hackers, and that at least four of those states' systems had been breached. *http://abcnews.go.com/US/russian-hackers-targeted-half-states-voter-registration-systems/story?id=42435822* (last accessed November 30, 2016). FBI Director James Comey ("Director Comey") specifically identified Russia as being at least partially involved in the attacks on U.S. election systems. *http://abcnews. go.com/US/russian-hackers-targeted-half-states-voter-registration-systems/story ?id=42435822* (last accessed November 30, 2016). The Department of Homeland Security acknowledged that it was offering assistance to individual states, and that at least four states had requested such assistance. *http://www.foxnews.com/politics/2016/09/30 /us-official-hackers-targeted-election-systems-20-states.html* (last accessed November 30, 2016).

12. These targeted attacks came in the wake of a prior hack of the Democratic National Committee ("DNC"), an attack that the National Security Agency stated was "undoubtedly the work of a foreign government" and that resulted in the leak of countless internal DNC e-mails in the months preceding the election. *http://www.washingtontimes. com/news/2016/nov/16/dnc-hack-conscious-effort-nation-state-nsa-chief-s/* (last accessed

4

November 30. 2016). On December 29, 2016. a Joint Analysis Report was issued by the FBI providing technical details "regarding the tools and infrastructure used by the Russian civilian and military intelligence services (RIS) to compromise and exploit networks and endpoints associated with the U.S. election. as well as a range of U.S. Government. political. and private sector entities." *https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296.pdf* (last accessed December 29, 2016).

Investigations Into Leaks Related To Secretary Hillary Clinton

13. On November 4. 2016. Rudy Giuliani ("Mr. Giuliani") appeared on Fox News and was asked about the then-recent report that the FBI was "re-opening" its investigation into alleged mishandling of classified information by Secretary Clinton and/or her aides. During the segment. Mr. Giuliani indicated that he had heard about "it" (without clarifying what "it" was) and that he had expected something similar to have occurred. Mr. Giuliani repeatedly stated that he is in close contact with allegedly former FBI agents/officials who themselves are allegedly in contact with active FBI agents/officials. *https://www.washingtonpost.com/news/post-nation/wp/2016/11/04/rudy-giuliani-is-claiming-to-have-insider-fbi-knowledge-does-he-really/?utm_term=.7a73e0ce788d* (last accessed November 29, 2016); *https://www.theguardian.com/us-news/2016/nov/03/fbi-leaks-hillary-clinton-james-comey-donald-trump* (last accessed November 29, 2016).

14. That same day. Congressmen Elijah E. Cummings (D-MD) and John Conyers. Jr. (D-MI) sent a letter to the Department of Justice Office of the Inspector General requesting an immediate investigation to determine the source(s) of the leaks. *http://democrats.oversight.house.gov/news/press-releases/cummings-and-conyers-*

*request-investigation-of-fbi-leaks-to-trump-campaign* (last accessed November 29, 2016). It is unclear whether any such investigation was actually conducted.

15. On November 1, 2016, Lieutenant General Michael Flynn (retired)("LTG Flynn") stated on Fox News that he had heard from "friends in the bureau" that there were multiple investigations. *https://twitter.com/ RobPulseNews/status /793862477629054976* (last accessed November 29, 2016). It is unclear whether the FBI conducted an investigation into who was allegedly providing this information to LTG Flynn.

16. Throughout the recent election cycle, there were a myriad of leaks concerning the FBI's investigation into alleged mishandling of classified information by Secretary Clinton and/or her aides. *https://www.theguardian.com/us-news/2016/nov/03/fbi-leaks-hillary-clinton-james-comey-donald-trump* (last accessed November 29, 2016); *http://nypost.com/2015/08/05/fbi-investigation-of-hillarys-emails-is-criminal-probe/* (last accessed November 29, 2016); *http://www.cbsnews.com/news/fbi-investigating-security-of-hillary-clintons-emails/* (last accessed November 29, 2016); *https://www.washington post.com/news/the-fix/wp/2016/03/28/there-are-147-fbi-agents-involved-in-the-hillary-clinton-email-investigation/* (last accessed November 29, 2016); *http://www.politifact. com/truth-o-meter/article/2016/may/12/fbis-investigation-hillary-clintons-emails-recap/* (last accessed November 29, 2016).

17. From former public officials to media pundits and journalists, individuals reported that an indictment of Secretary Clinton and/or her aides was "imminent" or "certain". *http://www.dailymail.co.uk/news/article-3387033/Former-federal-prosecutor-says-Hillary-indicted-60-days-FBI-compiles-overwhelming-evidence-against-her.html* (last accessed November 29, 2016); *http://insider.foxnews.com/2016/04/22/judge-napolitano-*

6

*fbi-has-evidence-indict-and-convict-hillary-clinton-email-scandal* (last accessed

November 29, 2016); *http://www.newsmax.com/Newsfront/tom-delay-hillary-clinton-indict-fbi/2016/01/25/id/710813/* (last accessed November 29, 2016). It remains unclear if

anyone has ever been investigated for these various leaks.

18. On November 2, 2016, Fox News anchor Bret Baier reported that an indictment

was likely in the alleged "pay for play" investigation into the Clinton Foundation's

activities. Mr. Baier claimed to be relying upon information from "FBI sources".

*http://www.realclearpolitics.com/video/2016/11/02/fbi_sources_tell_fox_news_indictmen*

*t_likely_in_clinton_foundation_case.html* (last accessed November 29, 2016). Within 48

hours, Mr. Baier walked back his claim that an indictment was likely. *http://video.*

*foxnews.com/v/5196826543001/?#sp=news-clips* (last accessed November 29, 2016).

Several other media networks, such as NBC News, ABC News and CNN, all reported

that their own alleged sources were rejecting Mr. Baier's claim that an indictment was

likely. *http://www.huffingtonpost.com/entry/fox-news-clinton-indictment-mistake_us_*

*581cc361e4b0d9ce6fbb9753* (last accessed November 29, 2016). It remains unclear if

anyone has ever been investigated for these various leaks.

19. On October 31, 2016, Slate reported on a possible computer server connection

between Trump Tower and a Russian bank, Alfa Bank. *http://www.slate.com/articles*

*/news_and_politics/ cover_story/2016/10/was_a_server_registered_to_the_trump_*

*organization_communicating_with_russia.html* (last accessed November 29, 2016). On

November 2, 2016, FBI sources informed CNN that although there were multiple

investigations into alleged connections between Russia and Donald Trump, no proof of

criminal connection had yet been found. *http://www.cnn.com/ 2016/11/01/politics/*

*donald-trump-russia-fbi-investigations/index.html* (last accessed November 29, 2016).

FBI sources also informed The New York Times that the agency did not believe the

server connecting Trump Tower to Alfa Bank had any nefarious purpose. *http://www.
nytimes.com/2016/11/01/us/politics/fbi-russia-election-donald-trump.html?_r=0* (last

accessed November 29, 2016). On November 7, 2016, however, Mrs. Mensch reported

that the FBI had secured a FISA warrant to investigate the server connection to Alfa

Bank. *http://heatst.com/ world/exclusive-fbi-granted-fisa-warrant-covering-trump-
camps-ties-to-russia/* (last accessed November 29, 2016). It remains unclear if anyone has

been investigated for their leaks to CNN or The New York Times.

### COUNT ONE – DOJ NSD

20. By letter dated November 30, 2016, the plaintiffs, JMP and Mrs. Mensch (referred

to jointly as "JMP"), submitted to DOJ NSD a FOIA request. The FOIA request

specifically sought copies of records, including cross-references, memorializing

investigations conducted into possible interference by foreign governments or non-

governmental organizations with the U.S. election on November 8, 2016.

21. Specifically, JMP indicated that the scope of the search should include any final

determinations identifying individual U.S. states whose election systems were targeted

and/or breached, any U.S. states whose vote tabulations were altered, and any

determinations made regarding the identity of the perpetrator(s) of these acts.

22. JMP clarified that the DOJ NSD could limit the timeframe of its search from

January 1, 2015, up until the date of acceptance of the request. JMP further clarified that

the scope of the DOJ NSD's search should not be limited to DOJ NSD-originated

records. JMP also requested that responsive records be produced in electronic form.

8

23. In the FOIA request, JMP pre-emptively waived any objection to the redaction of the names of any U.S. Government officials below a GS-14 position or whom otherwise were not acting in a supervisory position. JMP similarly waived any objection to redactions of the names of any U.S. Government contractors in a position of authority similar to that of a GS-13 series civilian employee or below.

24. In terms of all other third parties who work for the U.S. Government and whose names appear in records responsive to this request, JMP explained in detail that the privacy interests of those individuals have been diminished by virtue of their involvement in one or more of the U.S. Government functions described above as falling within the scope of the FOIA request. Relying upon the public interest aspect outlined regarding third party privacy interests, JMP stated that it was also seeking a waiver of fees or, at a minimum, a reduction in fees.

25. To date, no substantive response has been received by JMP from the DOJ NSD. JMP has constructively exhausted all required administrative remedies.

26. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the DOJ NSD of said right.

## COUNT TWO – FBI

27. By letter dated November 30, 2016, JMP submitted to the FBI a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016.

28. JMP repeats and realleges paragraphs 21-22, as JMP's request to DOJ NSD contained similar language to that contained in the FBI request regarding the scope and timeframes of the search for records.

29. JMP repeats and realleges paragraphs 23-24, as JMP's request to DOJ NSD contained similar language to that contained in the FBI request addressing privacy concerns and JMP's request for a fee waiver.

30. To date, no substantive response has been received by JMP from the FBI. JMP has constructively exhausted all required administrative remedies.

31. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the FBI of said right.

### COUNT THREE – CIA

32. By letter dated February 10, 2017, JMP submitted to CIA a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016.

33. JMP repeats and realleges paragraphs 21-22, as JMP's request to DOJ NSD contained similar language to that contained in the CIA request regarding the scope and timeframes of the search for records.

34. JMP repeats and realleges paragraphs 23-24, as JMP's request to DOJ NSD contained similar language to that contained in the CIA request addressing privacy concerns and JMP's request for a fee waiver.

35. To date, no substantive response has been received by JMP from CIA. JMP has constructively exhausted all required administrative remedies.

36. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by CIA of said right.

## COUNT FOUR – ODNI

37. By letter dated November 30, 2016, JMP submitted to ODNI a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016.

38. JMP repeats and realleges paragraphs 21-22, as JMP's request to DOJ NSD contained similar language to that contained in the ODNI request regarding the scope and timeframes of the search for records.

39. JMP repeats and realleges paragraphs 23-24, as JMP's request to DOJ NSD contained similar language to that contained in the ODNI request addressing privacy concerns and JMP's request for a fee waiver.

40. By letter dated December 15, 2016, ODNI assigned the request tracking number DF-2017-00062.

41. To date, no substantive response has been received by JMP from ODNI. JMP has constructively exhausted all required administrative remedies.

42. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by ODNI of said right.

11

## COUNT FIVE – DHS OIA

43. By letter dated November 30, 2016, JMP submitted two separate FOIA requests to DHS and DHS OIA. The FOIA requests specifically sought copies of records, including cross-references, memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016.

44. JMP repeats and realleges paragraphs 21-22, as JMP's request to DOJ NSD contained similar language to that contained in the DHS and DHS OIA requests regarding the scope and timeframes of the search for records.

45. JMP repeats and realleges paragraphs 23-24, as JMP's request to DOJ NSD contained similar language to that contained in the DHS and DHS OIA requests addressing privacy concerns and JMP's requests for a fee waiver.

46. On December 19, 2016, DHS informed JMP that it viewed the request submitted to DHS (designated as 2017-HQFO-00155) as a duplicate, as only DHS OIA would be reasonably likely to maintain responsive records. In reliance upon that information, JMP agreed to administratively close the request to DHS.

47. By letter dated January 11, 2017, DHS OIA issued a substantive response, releasing 2 pages of responsive records and referring 20 pages of responsive records to another government agency for processing. DHS OIA also indicated it was withholding 7 pages of responsive records in their entirety. Redactions and withholdings were made pursuant to Exemptions 3, 6, and 7(E). The request was designated as Request No. 2017-IAFO-00068.

48. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by DHS OIA of said right.

## COUNT SIX – FBI

49. By letter dated November 30, 2016, JMP submitted to FBI a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing crime reports filed regarding, investigations conducted into and/or disciplinary or legal actions taken as a result of unauthorized leaks of U.S. Government information to non-U.S. Government individuals.

50. Specifically, JMP indicated that the scope of the search could be limited to unauthorized leaks implicating the following:

1)   Information or documentation provided directly or indirectly to Mr. Giuliani;

2)   Information or documentation provided directly or indirectly to LTG Flynn;

3)   Information or documentation provided to unauthorized third parties regarding the investigations into alleged mishandling of classified information by Secretary Clinton and/or her senior aides;

4)   Information or documentation provided to unauthorized third parties regarding the investigations into alleged criminal actions by the Clinton Foundation; and

5)   Information or documentation provided to unauthorized third parties regarding the investigation into a computer server linking Trump Tower to a Russian financial institution.

13

51. JMP clarified that the FBI could limit the timeframe of its search from January 1, 2015, up until the date of acceptance of the request. JMP further clarified that the scope of the FBI's search should not be limited to FBI-originated records. JMP also requested that responsive records be produced in electronic form.

52. In the FOIA request, JMP pre-emptively waived any objection to the redaction of the names of any U.S. Government officials below a GS-14 position or whom otherwise were not acting in a supervisory position. JMP similarly waived any objection to redactions of the names of any U.S. Government contractors in a position of authority similar to that of a GS-13 series civilian employee or below.

53. In terms of all other third parties who work for the U.S. Government and whose names appear in records responsive to this request, JMP explained in detail that the privacy interests of those individuals have been diminished by virtue of their involvement in one or more of the U.S. Government functions described above as falling within the scope of the FOIA request. Relying upon the public interest aspect outlined regarding third party privacy interests, JMP stated that it was also seeking a waiver of fees or, at a minimum, a reduction in fees.

54. By letter dated January 31, 2017, the FBI determined that the request did not provide enough detail to enable personnel to locate records with a reasonable amount of effort. The FBI indicated it was administratively closing the request, which was designated as FOIPA Request Number NFP-64399.

55. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the FBI of said right.

14

## COUNT SEVEN – FBI

56. By letter dated November 30, 2016, JMP submitted to FBI a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing correspondence sent by the FBI to specific Members of Congress or Congressional committees regarding the FBI's investigations into:

1) Alleged mishandling of classified information by former Secretary of State Hillary Rodham Clinton ("Secretary Clinton") and/or her senior aides; and

2) Alleged criminal actions by the Clinton Foundation.

57. In the FOIA request, JMP indicated that the FBI could limit the timeframe of its search from January 1, 2015, up until the date of acceptance of the request. JMP also stated that it was also seeking a waiver of fees or, at a minimum, a reduction in fees.

58. To date, no substantive response has been received by JMP from the FBI. JMP has constructively exhausted all required administrative remedies.

59. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the FBI of said right.

## COUNT EIGHT – NSA

60. By letter dated November 30, 2016, JMP submitted to NSA a FOIA request. The FOIA request specifically sought copies of records, including cross-references, memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8, 2016.

61. JMP repeats and realleges paragraphs 21-22. as JMP's request to DOJ NSD contained similar language to that contained in the NSA request regarding the scope and timeframes of the search for records.

62. JMP repeats and realleges paragraphs 23-24. as JMP's request to DOJ NSD contained similar language to that contained in the NSA request addressing privacy concerns and JMP's request for a fee waiver.

63. By letter dated December 19. 2016. NSA issued a substantive response. The letter stated that NSA had not located any responsive records. NSA designated the FOIA request as FOIA Case 100294.

64. By letter dated January 3. 2017. JMP submitted an administrative appeal challenging the adequacy of NSA's search.

65. By letter dated January 24. 2017. NSA acknowledged receipt of the administrative appeal and assigned it Appeal Number 5030.

66. To date. no substantive response has been received by JMP from the NSA. JMP has constructively exhausted all required administrative remedies.

67. JMP has a legal right under the FOIA to obtain the information it seeks. and there is no legal basis for the denial by the NSA of said right.

## COUNT NINE – FEC

68. By letter dated November 30. 2016. JMP submitted to the FEC a FOIA request. The FOIA request specifically sought copies of records. including cross-references. memorializing investigations conducted into possible interference by foreign governments or non-governmental organizations with the U.S. election on November 8. 2016.

69. JMP repeats and realleges paragraphs 21-22, as JMP's request to DOJ NSD contained similar language to that contained in the FEC request regarding the scope and timeframes of the search for records.

70. JMP repeats and realleges paragraphs 23-24, as JMP's request to DOJ NSD contained similar language to that contained in the FEC request addressing privacy concerns and JMP's request for a fee waiver.

71. By letter dated December 14, 2016, the FEC issued a substantive response. The letter stated that no responsive records had been located. The FEC designated the request as Request Number FOIA 2017-017.

72. By letter dated December 16, 2016, JMP submitted an administrative appeal challenging the adequacy of the FEC's searches.

73. By e-mail dated February 3, 2017, the FEC issued a substantive response denying JMP's administrative appeal. The appeal was designated as Appeal No. 2017-01-A.

74. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the FEC of said right.

WHEREFORE, plaintiffs The James Madison Project and Louise Mensch pray that this Court:

(1) Orders the defendant federal agencies to disclose the requested records in their entirety and make copies promptly available to the plaintiffs;

(2) Award reasonable costs and attorney's fees as provided in 5 U.S.C. § 552 (a)(4)(E) and/or 28 U.S.C. § 2412 (d);

(3) expedite this action in every way pursuant to 28 U.S.C. § 1657 (a); and

(4) grant such other relief as the Court may deem just and proper.

Date:   March 14, 2017

Respectfully submitted.

/s/

_____

Bradley P. Moss. Esq.
D.C. Bar #975905
Mark S. Zaid. Esq.
D.C. Bar #440532
Mark S. Zaid. P.C.
1250 Connecticut Avenue. N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Brad@MarkZaid.com
Mark@MarkZaid.com

Attorneys for Plaintiffs

# Exhibit E



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE. MARYLAND 20755-6000

FOIA Case: 100294A
15 February 2018

BRAD MOSS
MARK S ZAID PC
1250 CONNECTICUT AVE NW STE 200
WASHINGTON DC  20036

Dear Mr. Moss:

This responds to your Freedom of Information Act (FOIA) request of
30 November 2016, which was received by this office on 1 December 2016, for
"...records memorializing investigations conducted into possible interference by
foreign governments or non-governmental organizations with the U.S. election
on November 8, 2016." Your request has been processed under the FOIA. As
provided in our initial response to you, dated 19 December 2016, your request
has been assigned case number 100294.

As also outlined in our letter to you of 19 December 2016, the National
Security Agency/Central Security Service (NSA/CSS) is the nation's cryptologic
organization, and we have a twofold mission. Our Information Assurance
mission is to provide solutions, products, and services to protect U.S.
information infrastructures critical to national security interests. In response
to requirements set at the highest levels of government, our Signals Intelligence
mission is to collect, process, and disseminate intelligence information from
foreign signals for national foreign intelligence and counterintelligence
purposes. The type of information you request, namely the "memorializ[ation] of
investigations" does not plainly fall within this Agency's intelligence mission or
Information Assurance mission.

As a result of the litigation and upon further review of your FOIA request,
we nevertheless conducted an additional search for responsive records to
ensure a comprehensive search for relevant material among NSA's
holdings.  We located responsive documents and are producing to you five (5)
pages of records.  Certain information, however, has been deleted from the
enclosures.

This Agency is authorized by various statutes to protect certain
information concerning its activities.  We have determined that such
information exists in these documents.  Accordingly, those portions are exempt
from disclosure pursuant to the third exemption of the FOIA, which provides
for the withholding of information specifically protected from disclosure by

FOIA Case:  100294A

statute.  The specific statutes applicable in this case are Title 18 U.S. Code 798 and Section 6, Public Law 86-36 (50 U.S. Code 3605).

In addition, personal information regarding individuals has been deleted from the enclosures in accordance with the sixth exemption of the FOIA, 5 U.S.C. 552(b)(6).  This exemption protects from disclosure information that would constitute a clearly unwarranted invasion of personal privacy.  In balancing the public interest for the information you request against the privacy interests involved, we have determined that the privacy interests sufficiently satisfy the requirements for the application of the sixth exemption.

Furthermore, some of the information has been deleted from the enclosures pursuant to the fifth exemption of the FOIA, 5 U.S.C. 552(b)(5). This exemption applies to inter-agency or intra-agency memoranda or letters which would not be available by law to a party in litigation with the agency, protecting information that is normally privileged in the civil discovery context, such as information that is part of a pre-decisional deliberative process and/or attorney-client privileged information and/or attorney-client work product.

Finally, additional documents responsive to your request were reviewed and have been withheld in full. The withheld material is exempt from disclosure pursuant to the first, third, and fifth exemptions of the FOIA.  The first exemption of the FOIA, 5 U.S.C. 552(b)(1), protects from disclosure information that is currently and properly classified in accordance with Executive Order 13526. This information meets the criteria for classification as set forth in Subparagraph (c) of Section 1.4 and remains classified TOP SECRET as provided in Section 1.2 of the Executive Order.  The information is classified because its disclosure could reasonably be expected to cause exceptionally grave damage to the national security. Furthermore, the number of responsive records withheld in full is similarly protected from disclosure pursuant to the first and third exemptions of the FOIA.

This is the final production for this matter.

Sincerely,

JOHN R. CHAPMAN
Chief, FOIA/PA Office
NSA Initial Denial Authority

Encls:
a/s

FOIA Case:  100294A

cc:    Louise Mensch
       116 West 80th Street
       N.Y., N.Y. 10024

# Exhibit F

Doc ID: 6607381



**ALEX PADILLA**
CALIFORNIA SECRETARY OF STATE

June 13, 2017

Admiral Michael S. Rogers
Director
National Security Agency
9800 Savage Rd., Suite 6272
Ft. George G. Meade, MD 20755-6000

Dear Admiral Rogers:

As the chief elections officer in the most populous state in the nation, I am seriously concerned about the National Security Agency's failure to provide timely and critical information to America's elections officials.

I also currently serve as co-chair of the Elections Committee for the National Association of Secretaries of State (NASS) and as a member the Department of Homeland Security's Election Infrastructure Cybersecurity Working Group. The stated purpose of the Working Group is to bring together federal, state, and local officials to ensure that critical information and cyber security best practices are being shared in a bipartisan and timely manner. We work in coordination with the U.S. Election Assistance Commission, the National Institute of Standards and Technology, the U.S. Department of Justice, and the Federal Bureau of Investigation.

Last year, heading into the presidential election, the FBI issued a nationwide alert regarding cyber targeting activity against state voter registration systems. This was helpful as states promptly worked with the Department of Homeland Security to ensure our systems were protected from such attacks. What is unclear now is whether the NSA possessed additional critical information prior to the 2016 Presidential Election that should have been shared with state and local elections officials in order to better defend ourselves against cyber intrusions.

Therefore, I request your response to the following questions:

- When did the NSA first receive documented threat intelligence information targeting our elections, including, but not limited to, the email spear-phishing campaign that is described in the recently leaked NSA report?
- Why was this information not promptly shared with our nation's election officials?
- The leaked report is dated May 5, 2017. Were you aware of these spear-phishing efforts or other efforts to breach election systems prior to the Presidential Election?
- Why did America's election officials have to learn about this threat seven months after the fact and as a result of a leaked document from an NSA contractor?
- What ongoing threats to our elections exist currently?

pproved for Release by NSA on 02-14-2018, FOIA Case # 100294 (litigation)

Doc ID: 6607381

Admiral Michael S. Rogers
June 13, 2017
Page Two

The security of our people and our democracy should be our absolute priority. Information-sharing was a key justification for the Department of Homeland Security's January, 2017 designation of election infrastructure as critical infrastructure. The purpose of federal agencies designating elections as critical infrastructure and conducting surveillance on nefarious actors is undermined when the information collected is not shared on a timely basis with those who most need it. Failing to provide timely and critical threat information to election officials places our democracy in harm's way.

Thank you for your attention to this matter. I look forward to your prompt reply.

Sincerely

ALEX PADILLA
California Secretary of State

cc: The Honorable Mitch McConnell, Senate Majority Leader
    The Honorable Charles Schumer, Senate Minority Leader
    The Honorable Paul Ryan, Speaker, U.S. House of Representatives
    The Honorable Nancy Pelosi, Leader, U.S. House of Representatives
    The Honorable Richard Burr, Chair, U.S. Select Committee on Intelligence
    The Honorable Mark Warner, Vice Chair, U.S. Select Committee on Intelligence
    The Honorable Devin Nunes, Chair, House Permanent Select Committee on Intelligence
    The Honorable Adam Schiff, Ranking Member, House Permanent Select Committee on Intelligence
    The Honorable Dianne Feinstein, U.S. Senator
    The Honorable Kamala Harris, U.S. Senator
    California Congressional Delegation

# Exhibit G

Doc ID: 6607208
UNCLASSIFIED—FOR OFFICIAL USE ONLY—

Security Classification



# NSA STAFF PROCESSING FORM

| TO DIR | EXREG CONTROL NUMBER CATS 2017-05807 | | KCC CONTROL NUMBER | |
|---|---|---|---|---|
| THRU D/Dir Exec DIR | COS | ACTION | EXREG SUSPENSE | |
| S | | ☐ APPROVAL | KCC SUSPENSE | |
| (U) Response Letter to California Secretary of State | | ☒ SIGNATURE | ELEMENT SUSPENSE | |
| | | ☐ INFORMATION | | |

DISTRIBUTION

(b) (6)

(b) (3) - P.L. 86-36
(b) (5)

SUMMARY

☒ Change Name and Date on name type

COORDINATION/APPROVAL

| OFFICE | NAME AND DATE | SECURE PHONE | OFFICE | NAME AND DATE | SECURE PHONE |
|---|---|---|---|---|---|
| ☑ LSLA | T. Soule | 1/8/17 | | | |
| ☑ D LSLA | | ✓ | (b) (3) - P.L. 86-36 | | |
| ☑ A. LSLA | 28 Jun 17 | | | | |
| ☑ OGC Leg | 28 Jun 17 | | | | |
| ☑ CAO | 28 Jun 17 | | | | |
| ☐ LALI | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

| ORIGINATOR | | ORG | PHONE (Secure) 963-3747 | DATE PREPARED 20170629 |
|---|---|---|---|---|

SECURITY CLASSIFICATION

UNCLASSIFIED—FOR OFFICIAL USE ONLY—

Derived From: _____
Dated: _____
Declassify On: _____

Doc ID: 6607208



**NATIONAL SECURITY AGENCY**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

14 July 2017

The Honorable Alex Padilla
California Secretary of State
1500 11ᵗʰ Street
Sacramento, CA 95814

Dear Mr. Secretary:

Thank you for your letter dated 13 June 2017 which references press reports about foreign powers' attempts to undermine or interfere with U.S. elections. I want to assure you that the National Security Agency ("NSA" or "Agency") agrees wholeheartedly with your statement that, "The security of our people and our democracy should be our absolute priority." The men and women of NSA live this creed every day. The Agency works hard to collect, process, and disseminate foreign intelligence information that is needed to protect the Nation's democratic institutions. In addition, NSA possesses significant cybersecurity expertise that is leveraged to secure national security systems. The Agency also regularly makes its unclassified cybersecurity insights available to the public in an effort to help the Nation improve its overall cybersecurity posture.

NSA generally does not comment on press reports that purport to discuss classified intelligence information since doing so can compromise sensitive intelligence sources and methods and ongoing activities of the Federal Government. However, I can assure you that NSA provides key intelligence insights in the effort to thwart hostile foreign entities from interfering with our nation's elections on any level. We do this through the sharing of foreign cyber threat intelligence with other departments and agencies, including the Department of Homeland Security (DHS) and the Federal Bureau of Investigation (FBI). The recipients of NSA's intelligence reporting are then able to work with affected entities, including state and local officials, so that action may be taken that responds to the identified threats. Through these collaborative roles, foreign threat intelligence obtained by NSA is made actionable while protecting the very sensitive sources and methods that continue in place so that we can obtain warnings of any future threats aimed at the Nation.

I can also assure you that NSA produces and shares such intelligence when it actually becomes available. Reporting on past events should not be construed to suggest that intelligence is being withheld or that its production has not received prioritized focus. Instead it reflects the natural time gap between when the collection occurs, and when the subsequent reports are finished.

As you mentioned in your letter, DHS and the FBI worked closely with state and local election officials during the 2016 elections to protect state voter registration systems from hostile cyber activity. California's continued participation in the DHS Election Infrastructure Cybersecurity Working Group is a key factor in helping protect its elections going forward.

Doc ID: 6607208

As you noted, the Working Group conducts its activities in coordination with the U.S. Election Assistance Commission, the National Institute of Standards and Technology, the U.S. Department of Justice, and the FBI. To that end, I am sharing our correspondence with the lead for the Working Group, Mr. Robert Gatlin, and Special Assistant to the Deputy Assistant Secretary for any appropriate follow-on collaboration.

Thank you again for your correspondence and for your vigilance with respect to this important issue and our nation's security.

MICHAEL S. ROGERS
Admiral, U.S. Navy
Director, NSA

Copies furnished:

Mr. David Hess, Senior Official Performing the
  Duties of the Under Secretary, National
  Protection & Programs Directorate,
  Department of Homeland Security

Mr. Robert Gatlin, Special Assistant to the Deputy
  Assistant Secretary, National Protection &
  Programs Directorate/Cybersecurity &
  Communications/Front Office

The Honorable Richard Burr, Chair,
  U.S. Select Committee on Intelligence

The Honorable Mark Warner, Vice Chair,
  U.S. Select Committee on Intelligence

The Honorable Devin Nunes, Chair,
  House Permanent Select Committee on Intelligence

The Honorable Adam Schiff, Ranking Member,
  House Permanent Select Committee on Intelligence

**Exhibit H**

Doc ID: 6623060
UNCLASSIFIED//FOR OFFICIAL USE ONLY

---

Security Classification

# NSA STAFF PROCESSING FORM

| TO DIR | | EXREG CONTROL NUMBER CATS 2017-05807 | | KCC CONTROL NUMBER | |
|---|---|---|---|---|---|
| THRU D/Dir | Exec DIR | COS | | | |

| | ACTION | EXREG SUSPENSE |
|---|---|---|
| | ☐ APPROVAL | KCC SUSPENSE |
| (U) Response Letter to California Secretary of State | ☒ SIGNATURE | ELEMENT SUSPENSE |
| | ☐ INFORMATION | |

DISTRIBUTION

(b) (6)

(b) (3) - P.L. 86-36
(b) (5)

SUMMARY

---

☒ Change Name and Date column(s) type

**COORDINATION/APPROVAL**

| | OFFICE | NAME AND DATE | SECURE PHONE | OFFICE | NAME AND DATE | SECURE PHONE | |
|---|---|---|---|---|---|---|---|
| ☑ | LSLA | T. Soule    6/3(/17 | | | | | ☐ |
| ☑ | D LSLA | | | | | | ☐ |
| ☑ | A. LSLA | J. Emmel //e// 28 Jun17 | | | (b) (3) - P.L. 86-36 | | ☐ |
| ☑ | OGC Leg | //e//28 Jun17 | | | | | ☐ |
| ☑ | CAO | //e// 28 Jun17 | | | | | ☐ |
| ☐ | EAD | | | | | | ☐ |
| ☐ | | | | | | | ☐ |
| ☐ | | | | | | | ☐ |
| ☐ | | | | | | | ☐ |
| ☐ | | | | | | | ☐ |

| ORIGINATOR | | ORG | PHONE (Secure) 963-3747 | DATE PREPARED 20170629 |
|---|---|---|---|---|

FORM A6796D REV FEB 10 2016 (Supersedes A6796D OCT 2014) NSN 7540 FM 001-5455

SECURITY CLASSIFICATION

Derived From: _____
Dated: _____
Declassify O  UNCLASSIFIED//FOR OFFICIAL USE ONLY

Approved for Release by NSA on 06-15-2018, FOIA Case # 100294 (litigation)

Doc ID: 6623060



**NATIONAL SECURITY AGENCY**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

14 July 2017

The Honorable Alex Padilla
California Secretary of State
1500 11th Street
Sacramento, CA 95814

Dear Mr. Secretary:

Thank you for your letter dated 13 June 2017 which references press reports about foreign powers' attempts to undermine or interfere with U.S. elections. I want to assure you that the National Security Agency ("NSA" or "Agency") agrees wholeheartedly with your statement that, "The security of our people and our democracy should be our absolute priority." The men and women of NSA live this creed every day. The Agency works hard to collect, process, and disseminate foreign intelligence information that is needed to protect the Nation's democratic institutions. In addition, NSA possesses significant cybersecurity expertise that is leveraged to secure national security systems. The Agency also regularly makes its unclassified cybersecurity insights available to the public in an effort to help the Nation improve its overall cybersecurity posture.

NSA generally does not comment on press reports that purport to discuss classified intelligence information since doing so can compromise sensitive intelligence sources and methods and ongoing activities of the Federal Government. However, I can assure you that NSA provides key intelligence insights in the effort to thwart hostile foreign entities from interfering with our nation's elections on any level. We do this through the sharing of foreign cyber threat intelligence with other departments and agencies, including the Department of Homeland Security (DHS) and the Federal Bureau of Investigation (FBI). The recipients of NSA's intelligence reporting are then able to work with affected entities, including state and local officials, so that action may be taken that responds to the identified threats. Through these collaborative roles, foreign threat intelligence obtained by NSA is made actionable while protecting the very sensitive sources and methods that continue in place so that we can obtain warnings of any future threats aimed at the Nation.

I can also assure you that NSA produces and shares such intelligence when it actually becomes available. Reporting on past events should not be construed to suggest that intelligence is being withheld or that its production has not received prioritized focus. Instead it reflects the natural time gap between when the collection occurs, and when the subsequent reports are finished.

As you mentioned in your letter, DHS and the FBI worked closely with state and local election officials during the 2016 elections to protect state voter registration systems from hostile cyber activity. California's continued participation in the DHS Election Infrastructure Cybersecurity Working Group is a key factor in helping protect its elections going forward.

Doc ID: 6623060

As you noted, the Working Group conducts its activities in coordination with the U.S. Election Assistance Commission, the National Institute of Standards and Technology, the U.S. Department of Justice, and the FBI. To that end, I am sharing our correspondence with the lead for the Working Group, Mr. Robert Gatlin, and Special Assistant to the Deputy Assistant Secretary for any appropriate follow-on collaboration.

Thank you again for your correspondence and for your vigilance with respect to this important issue and our nation's security.

MICHAEL S. ROGERS
Admiral, U.S. Navy
Director, NSA

Copies furnished:

Mr. David Hess, Senior Official Performing the
  Duties of the Under Secretary, National
  Protection & Programs Directorate,
  Department of Homeland Security

Mr. Robert Gatlin, Special Assistant to the Deputy
  Assistant Secretary, National Protection &
  Programs Directorate/Cybersecurity &
  Communications/Front Office

The Honorable Richard Burr, Chair,
  U.S. Select Committee on Intelligence

The Honorable Mark Warner, Vice Chair,
  U.S. Select Committee on Intelligence

The Honorable Devin Nunes, Chair,
  House Permanent Select Committee on Intelligence

The Honorable Adam Schiff, Ranking Member,
  House Permanent Select Committee on Intelligence